75 Cal.Rptr.2d 125 (1998)
64 Cal.App.4th 163
The PEOPLE, Plaintiff and Respondent,
v.
$9,632.50 UNITED STATES CURRENCY, Defendant.
Abel R. Cortez, Defendant and Appellant.
No. F026452.
Court of Appeal, Fifth District.
May 22, 1998.
*126 Joseph S. King, Bakersfield, for Defendant and Appellant.
Edward R. Jagels, District Attorney and Michael J. Yraceburn, Bakersfield, for Plaintiff and Respondent.

OPINION
STONE (W.M.A.), Associate Justice.

INTRODUCTION
This case involves a civil forfeiture under Health and Safety Code[1] section 11470, subdivision (f), of $9,632.50 in cash belonging to Abel R. Cortez, appellant, located in a savings account at First Interstate Bank. Section 11470, subdivision (f) provides for forfeiture of "[a]ll moneys ... furnished ... by any person in exchange for a controlled substance, [and] all proceeds traceable to such an exchange...." The primary issue is whether the statute authorizes forfeiture of an entire bank account that contains both drug proceeds and funds from legitimate sources. The secondary issue concerns whether substantial evidence supports forfeiture of the account proceeds directly attributable to drug trafficking.
Officers of the Bakersfield Police Department seized a bank account at First Interstate Bank belonging to appellant. Following a nonjury trial upon respondent's amended petition, the court issued a statement of decision in favor of respondent.

FACTS
Appellant worked for Johnston Farms and lived rent-free in a house on Johnston Farms' Sunshine Ranch in Kern County. Appellant's wife, stepson, stepdaughter, and daughter lived with him. His brother, Jesus Cortez, also lived on the ranch in another house. Officers of the Bakersfield Police Department executed a search warrant at the ranch. They sought and found a methamphetamine laboratory operating in and next to a barn. Both appellant and his brother were arrested and later pled guilty to manufacturing methamphetamine. At the time of his arrest, appellant told Officer Caldas and Detective Maxwell that, between April and July 1994, he had accepted $8,000 from Rosendo Trancoso in exchange for letting Trancoso run a laboratory in the barn. He received this money in two payments: one $2,000 payment in April and another $6,000 payment sometime between April and July. Appellant told police he had deposited the money into a savings account at First Interstate Bank. Appellant also said he had participated in the operation by mixing chemicals in a bucket and assisting in the "finish" product.
On the day of the arrest, Detective Armbruster, in charge of asset forfeiture cases, caused a seizure warrant to be issued for all proceeds in appellant's First Interstate Bank account. Appellant then filed a petition contending he was entitled to return of the funds.
Bank account records showed three cash deposits during the relevant period:

 February 1994 $250
 April 1994 $600
 May 1994 $100

All other deposits were Johnston Farms payroll checks, a 1993 Johnston Farms bonus check, and a 1993 income tax refund check. There were no cash deposits of $2,000, $6,000, or $8,000.
Appellant's wife, Maria, and stepdaughter, Lydia, testified each of them held jobs, as did appellant's stepson. They explained that each payday they typically cashed their checks and turned over all or most of the cash to appellant, who paid all of the household bills. Lydia testified they were pooling money in order to buy a house. Appellant testified he received cash from his family members, all money was pooled, and "whenever he could," he deposited into the savings account his payroll checks as well as any cash left over after the bills were paid. He acknowledged he was not able to make cash deposits every month.
*127 Detective Armbruster prepared a schedule of appellant's monthly expenses, which totaled $1,153. Appellant's monthly income from Johnston Farms was $1,210. Based upon his apparent belief that appellant had no other legitimate source of income, Armbruster offered the opinion that appellant's cash deposits into his savings account must have come from the cash paid to him for use of the barn as a methamphetamine laboratory. However, on cross-examination Armbruster admitted he had not been advised other family members were working or family income was being pooled.
Appellant denied telling police he received money from Trancoso for running a laboratory denied admitting any involvement with or knowledge of the methamphetamine operation, and denied ever saying he had deposited drug money into the First Interstate Bank account.
The trial court found:
During the period from March 1994 to July 1994, appellant received $8,000 in cash as payment for use of his barn as a methamphetamine laboratory.
Of that $8,000, appellant deposited $700 cash into his savings account in two transactions: $600 on April 7, 1994, and $100 on May 7, 1994.
The remaining deposits to appellant's savings account between December 1993 and June 1994, totaling $8,932.50, consisted of income tax refund checks issued by the Internal Revenue Service and payroll and bonus checks issued by Johnston Farms.
Appellant was not credible when he testified he did not receive $8,000 in cash for use of the barn and he did not deposit $8,000 currency in cash, or any portion thereof, into the savings account.
The court then concluded:
The $8,000 cash appellant received for use of the barn was traceable to an exchange for a controlled substance within the meaning of section 11470, subdivision (f).
The $700 deposited to the savings account was part of the $8,000.
Appellant was not an innocent owner[2] because he had actual knowledge of the activity that made defendant property subject to forfeiture.
A sufficient nexus existed between appellant's narcotics activity and the defendant property to subject the property to forfeiture under section 11470, subdivision (f).
The nexus was sufficient to taint the entire defendant property.
Accordingly, the court ordered the entire sum, $9,632.50, forfeited to the state.

DISCUSSION

I.

Forfeiture: A Commingled Bank Account
Appellant contends the court erred in ordering forfeiture of the entire bank account because, at most, $700 in the account was drug money. Under the California forfeiture scheme, the state is entitled to a judgment of forfeiture on cash amounts of less than $25,000 only if it can prove beyond a reasonable doubt that the cash consists of "[m]oneys ... furnished by any person in exchange for a controlled substance" or "proceeds traceable to such an exchange...." (§ 11470, subd. (f); 11488.4, subd. (i)(2).) Here, though, the court expressly found only $700 of the $9,632.50 in appellant's bank account represented "proceeds traceable to an exchange for a controlled substance[,]" it awarded the state the entire sum on the theory that, once some drug money was commingled with other funds, the other funds became tainted and *128 subject to forfeiture, even though the original drug money could be quantified.
The parties have cited neither California case law nor any pertinent legislative history definitively resolving the question whether commingling in a bank account the cash proceeds of drug transactions with funds derived from legitimate sources renders the entire account subject to forfeiture. Our search also has failed to uncover any California law on point. Because the California drug asset forfeiture statutes are modeled on the federal forfeiture laws, federal case law, while not controlling, is highly persuasive in deciding drug forfeiture issues. (People v. $8,921 United States Currency (1994) 28 Cal.App.4th 1226, 1232, 34 Cal. Rptr.2d 210.)[3]
We find most helpful U.S. v. Pole No. 3172, Hopkinton (1st Cir.1988) 852 F.2d 636 (Pole No. 3172), in which the government obtained a summary judgment ordering forfeiture of real property allegedly purchased with drug proceeds. The trial court held under 21 United States Code section 881(a)(6), the proceeds were traceable to a drug exchange. Reversing, the circuit court noted the facts were insufficient to establish probable cause to believe the entire parcel of real estate was forfeitable. The facts showed Fogarty, the owner of real property, used legitimate funds to make a 20.8 percent down payment on that property two years before he became involved in drug activity. (Id. at p. 639.) The court rejected the government's argument that the entire parcel was subject to forfeiture because Fogarty paid the mortgage with drug money after he started dealing drugs. It stated:
"We agree that the interest acquired as a result of mortgage payments made with the proceeds of drug transactions should be forfeitable. We do not believe, however, that forfeitability spreads like a disease from one infected mortgage payment to the entire interest in the property acquired prior to the payment. After all, only the actual proceeds of drug transactions are forfeitable. Unless [§ 21 U.S.C.] section 881(a)(6) deprives persons accused of dealing drugs of the right to own any property, the existence of an undivided interest in a felon's property which constitutes proceeds cannot mean that his entire property is proceeds." (Pole No. 3172, supra, 852 F.2d at pp. 639-640, emphasis added.)
Thus, the court concluded the government could gain an interest equal only to the portion of the property which Fogarty acquired as a result of tainted mortgage payments.[4]
Two years later, the Fifth Circuit, citing Pole No. 3172, supra, reversed a summary judgment forfeiting properties in their entirety when there was some evidence that they were purchased partially with legitimate funds. (U.S. v. One 1980 Rolls Royce, VIN No. SRL 39955 (5th Cir.1990) 905 F.2d 89.) The court rejected the government's argument that if one dollar of drug money is used to purchase an asset, that entire asset is forfeitable. It discussed and distinguished cases in which a claimant alleged some of the forfeited assets were not drug proceeds, but failed to present any credible evidence of a legitimate source of funds. (See, e.g., U.S. v. Premises Known as 3639-2nd St., N.E. (8th Cir.1989) 869 F.2d 1093, 1097.) It also distinguished situations in which a claimant invests drug proceeds in an asset that appreciates in value, then asserts that only the amount of the original investment should be forfeited. (See, e.g., U.S. v. Real Estate Located at 116 Villa Rella Dr. (S.D.Fla.1987) *129 675 F.Supp. 645 (116 Villa Rella Dr.).)[5] But the court also made clear that if assets were purchased with both legitimate and illegitimate funds, only the portion traceable to illegitimate funds was forfeitable. The Ninth Circuit agrees. (See U.S. v. Real Property Located at 20832 Big Rock Dr. (9th Cir.1995) 51 F.3d 1402, 1411 ["Any interest in property purchased with illegitimate assets is forfeitable, but any interest purchased with legitimate assets, even the legitimate assets of a drug dealer ... is not forfeitable because it is not `proceeds traceable to' a drug transaction."]; see also, U.S. v. Premises Known as 2639 Meetinghouse (E.D.Pa.1986) 633 F.Supp. 979, 988 ["[i]f legitimate assets are commingled with drug proceeds, only the drug proceeds, whatever their form, are subject to forfeiture"].)
In dicta, the Second Circuit likewise has suggested that when drug proceeds are commingled with legitimate funds, the government may obtain only the drug proceeds. (See United States v. Banco Cafetero Panama (2d Cir.1986) 797 F.2d 1154 (Banco Cafetero Panama).) In Banco Cafetero Panama, the court rejected the argument of a drug dealer that once he had deposited drug proceeds into a bank account and his money was pooled with all the other money in the bank's other accounts, his funds could not be forfeited because they were no longer proceeds traceable to a drug transaction. (Id. at pp. 1158-1160.) In evaluating the process of tracing cash deposited in bank accounts, the court alluded to the specific problem now Confronting us: how to handle a general purpose bank account in which drug proceeds might be commingled with legitimate funds. It examined federal legislative history and concluded Congress intended the government to be able to reach into such an account and withdraw the money obtained from drug sales. Although the court's holding was that drug money commingled with legitimate money was forfeitable, its dicta implied, conversely, that the account's legitimate money was not. One of the court's examples clarifies its position. In discussing what could properly be characterized as traceable proceeds, the court hypothesized:
"... For example, if $100 from the sale of drugs is deposited in an account funded with untainted money, $100 in the account and each $100 withdrawal are all vulnerable to forfeiture, but the Government can obtain only a single forfeiture of $100." (797 F.2d at p. 1161, fn. 9.)
In the case we now consider, the trial court supported its judgment ordering the entire bank account forfeited with an Eleventh Circuit decision. (One Single Family Residence, supra, 933 F.2d at p. 982.) In One Single Family Residence, two brothers, Gary and Curtis, purchased investment property on which they built a house. Gary's investment funds came from legitimate savings; Curtis's funds came from drug trafficking. When the United States filed a complaint for forfeiture under 21 United States Code section 881(a)(6), Gary tried to avail himself of the statute's innocent owner language, contending the percentage of the real property's value attributable to his investment of legitimate funds should not be subject to forfeiture. The court held Gary was not an innocent owner because he knew he was entering a business deal in which the co-owner's funds came from drug dealing. The court remarked, "'those who normally do business with drug dealers do so at their own risk.'" (One Single Family Residence, supra, 933 F.2d at p. 982, quoting United States v. $4,255,000 (11th Cir.1985) 762 F.2d 895, 905.)
The facts of One Single Family Residence, supra, render it inapposite. The case turned on the application to Gary of the innocent owner exception of 21 United States Code section 881(a)(6). Because Gary knew he was making an investment that would be funded partially with drug money he did not meet the statutory criteria for an innocent owner, and thus could not retain even the portion of his interest in the real property *130 attributable to his investment of legitimate funds. The evidence showed Curtis actively set up additional drug deals in order to get enough money for the investment. In effect, the purportedly innocent owner may have been facilitating or encouraging the guilty owner's drug dealing.
Also inapposite is Bennis v. Michigan (1996) 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68 (Bennis). Bennis concerned not forfeiture of traceable proceeds from drug sales, but the public nuisance abatement of an automobile used as an instrumentality of the crime of prostitution. The Supreme Court ruled that a wife who did not know her husband was using the family car for a rendezvous with a prostitute was entitled to procedural due process, but, despite her innocence, a statute that failed to protect her property interest did not violate the United States Constitution. The court's decision rested on a "long and unbroken line of cases [holding] that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use." (Id. at p. 446, 116 S.Ct. at p. 998.)[6]
The courts' concerns in One Single Family Residence, supra, 933 F.2d 976 and Bennis, supra, 516 U.S. 442, 116 S.Ct. 994, do not confront us here. No third person encouraged appellant's involvement in drug activity by becoming his business partner, as Gary encouraged Curtis in One Single Family Residence. And unlike the car in Bennis, appellant's bank account was not used to facilitate a crime. Like Fogarty in Pole No. 3172, supra, 852 F.2d 636, appellant had money from legitimate and illegitimate sources. To the extent the state meets its burden of proving funds are either actual drug proceeds or property acquired with those proceeds, appellant must forfeit them.
But nothing in the California forfeiture scheme or the cases interpreting it suggests the Legislature intended untainted assets (whether belonging to a third person or person involved in drug activity) to be subject to forfeiture simply because they were in proximity with forfeitable assets.
Respondent urges this court to interpret the statute broadly in order to further the Legislature's intent of "removing the tools and profits from those engaged in the illicit drug trade...." (§ 11469, subd. (j); emphasis added.) Respondent reasons: Appellant evidently spent his drug money on routine living expenses and banked his payroll, bonus, and tax refund checks. Thus, the legitimate money in his bank account actually represents profits from illicit drug transactions because, without the drug money, the bank account could not have increased. Respondent, in effect, asks us to hold that proceeds traceable to an exchange for a controlled substance include any assets the claimant would not possess had he not been able to use drug money for routine financial needs.
Carried to its logical extreme, respondent's theory would eliminate the need for tracing, despite the statute's clear language requiring it. We illustrate our point. Without a doubt, an asset purchased with drug proceeds can be forfeited because the asset is directly traceable to drug money. Hence, if evidence showed claimant took his $8,000 and purchased a car for $8,000, that car could be seized; it would be the product of drug proceeds. In contrast, under respondent's theory, the direct link between the car and drug money could be eliminated. Thus, if the claimant had spent his $8,000 drug money for food and lodging and used $8,000 in salary to buy that same car, the car could still be *131 seized. Such a result would effectively repeal the statutory requirement of tracing.
In support of its theory, respondent cites Check No. 25128, supra, 122 F.3d 1263. This case, however, fails to support respondent's broad interpretation of traceable proceeds. In Check No. 25128, the court upheld forfeiture of interest paid on a principal sum of indisputable drug money. Police illegally seized drug money during a drug raid of claimant's home. After claimant prevailed on a suppression motion, he was unable to recover the money because the City of Fairbanks had turned it over to the Drug Enforcement Administration. He sued the city for conversion. When he won, the city paid him the money, plus interest, in the form of a cashier's check drawn from the city's general revenue fund. The federal government promptly seized the check as forfeitable drug proceeds. The court rejected claimant's assertion that by the time the funds made their way back to him, they were no longer traceable drug proceeds but, rather, proceeds of his conversion suit.[7] The court noted the money forfeited need not be the identical money seized so long as it was directly traceable to drug proceeds. The court also held the interest earned on the drug money, as well as the originally seized principal, was forfeitable as traceable to illicit drug transactions. While the court did acknowledge the legislative purpose to eliminate drug dealers' profits, it did not suggest the need for tracing could be ignored in pursuit of that legislative goal.
Check No. 25128 is distinguishable. There, one identifiable sum of money simply moved through different bank accounts, eventually finding its way back to claimant, having earned him some interest on its journey. The principal sum originally seized was traceable drug money; the interest was direct profits from that principal sum. Here, in contrast, respondent is attempting to forfeit money that was never drug proceeds, but, rather, money that indisputably was legitimate. Respondent's view of profits includes not only the interest the drug money itself might have earned, but also includes any asset obtained by a drug dealer which he might not have been able to afford if he had not been dealing drugs, regardless of whether it can be shown that the asset was actually purchased with tainted funds. This view is tantamount to saying that persons accused of dealing drugs should be deprived of the right to own any property (cf., Pole No. 3172, supra, 852 F.2d at p. 640). The statute authorizes forfeiture only of proceeds traceable to an exchange for a controlled substance. It does not authorize forfeiture of the increase in net worth that would not have occurred but for the person having acquired drug money. Such an expansion of the forfeiture law should be left to the Legislature.
In any event, the trial court did not rule the entire account was forfeitable because it was broadly traceable to drug proceeds. It did not find that the $8,932.50 over and above the $700 in drug money was a tool of or profit from illicit drug trade. (See § 11469, subd. (j).) Quite the contrary, the court expressly found $700 was drug money and the rest of the account was forfeitable because it had become contaminated by its proximity to the tainted $700. In the trial court's words, "The remaining deposits to the Savings Account were made from December, 1993 through June, 1994, totaling $8,932.50 and consisted of income tax refund checks issued by the IRS and payroll and bonus checks issued by Johnston Farms, the employer of Abel Cortez." No authority we have found supports a forfeiture of those "remaining deposits."
On this record, the only amounts traceable to drug transactions are the $700 that the court ruled was drug money and any interest actually earned on that sum. The remainder of the account, as legitimate funds not traceable to drug transactions, must be returned to claimant.

II.

Substantial Evidence: $700 as Proceeds Traceable to an Exchange for a Controlled Substance
Appellant contends no substantial evidence supports the trial court's finding that *132 the $700 cash was part of the $8,000 he received for renting his barn because the $8,000 was not the only cash appellant possessed between: April and July 1994. Rather, appellant, his wife, and his stepdaughter testified all the adult family members worked and regularly turned over most of their earnings to appellant in cash. Moreover, while appellant received two drug-related cash sums$2,000 and $6,000no cash deposits into his account matched or appeared to relate to these sums.
In evaluating appellant's argument we review the entire record in the light most favorable to respondent and "'must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (People v. Johnson (1980) 26 Cal.3d 557, 576, 162 Cal. Rptr. 431, 606 P.2d 738.) It is not our job to determine whether the evidence would have convinced us beyond a reasonable doubt; we must determine whether any rational trial judge could have reached the challenged conclusion. (Id. at p. 576, 162 Cal.Rptr. 431, 606 P.2d 738.) A factfinder is entitled to reject even uncontradicted testimony (Ortzman v. Van Der Waal (1952) 114 Cal.App.2d 167, 170, 249 P.2d 846) and may, if it wishes, base its decision on the testimony of a single credible witness (Marriage of Mix (1975) 14 Cal.3d 604, 614, 122 Cal.Rptr. 79, 536 P.2d 479).
The court expressly found incredible appellant's testimony that he did not receive the $8,000 and did not deposit any drug proceeds into his bank account. It also could properly reject the testimony of his family members, hardly unbiased witnesses. Thus, the trial court could determine appellant's only sources of income from April to July 1994 were his paychecks (most of which he was depositing into the account) and the $8,000 in cash drug money: any cash remaining after paying monthly expenses had to have been from the $8,000. Appellant's own crime scene admission that the $8,000 went into his First Interstate Bank account bolsters such a finding.
Since the $8,000 was paid to appellant by someone who was manufacturing and presumably selling methamphetamine, the $8,000 were proceeds traceable to an exchange for a controlled substance. Substantial evidence supports the finding that the $700 was part of the $8,000.

DISPOSITION
The matter is remanded to the superior court to modify the judgment to order forfeited the amount of $700 plus interest, and to order returned to appellant the balance of the moneys held.
ARDAIZ, P.J., and LEVY, J., concur.
NOTES
[1] All statutory references are to the Health and Safety Code unless otherwise noted.
[2] California, like the United States, to some extent protects property interests of "innocent" parties in otherwise forfeitable assets. Innocent owners are expressly mentioned in the federal statute pertaining to forfeiture of cash: "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act ... committed or omitted without the knowledge or consent of that owner." (21 U.S.C. § 881(a)(6).) In contrast, section 11470 expressly mentions innocent owners only in connection with otherwise forfeitable real property actually used for drug manufacture or sales. "[P]roperty which is used as a family residence or for other lawful purposes, or which is owned by two or more persons, one of whom had no knowledge of its unlawful use, shall not be subject to forfeiture." (§ 11470, subd. (g).)
[3] See Senate Committee on the Judiciary regarding Senate Bill No. 1158 (1993-94 Reg. Sess.), noting that the purpose of the proposed 1994 bill was to "make asset forfeiture laws permanent, to expand asset forfeiture to additional offenses, to adjust state forfeiture law to more closely parallel federal law, and to streamline court procedures relating to asset forfeiture." (Emphasis added.)
[4] The burden of proof in a federal action is different from that in California. The United States needs to show only that there is probable cause to believe property is subject to forfeiture. The burden then shifts to the claimant to show the property is not forfeitable. (U.S. v. One Single Family Residence (11th Cir.1991) 933 F.2d 976, 982 (One Single Family Residence).) In California, the state bears the burden of proving the property is forfeitable. Depending upon the asset involved, the burden may be to prove forfeitability by clear and convincing evidence or, as in this case, beyond a reasonable doubt. (§ 11488.4, subd. (i)(2).)
[5] The court agreed with the holding in 116 Villa Rella Dr., supra, that profits that flow directly from tainted drug money are forfeitable. Thus, the appreciated value of a house purchased with drug money would be forfeitable, as presumably would be interest on a bank account containing nothing but drug money. (Cf., U.S. v. Check No. 25128 in Amount of $58,654.11 (9th Cir.1997) 122 F.3d 1263 (Check No. 25128) [interest earned on the principal sum of drug trafficking proceeds was forfeitable, along with the principal, as traceable proceeds].)
[6] Justices Stevens, Souter and Breyer joined in a passionate dissent. (Bennis, supra, 516 U.S. at p. 458, 116 S.Ct. at p. 1003.) Justice Kennedy dissented separately. (Id. at p. 472, 116 S.Ct. p. at 1010.) Moreover, Bennis has been the subject of extensive critical commentary. (See, e.g., Luna, Fiction Trumps Innocence: The Bennis Court's Constitutional House of Cards (1997) 49 Stan. L.Rev. 409 (case note); Boudreaux & Pritchard, Innocence Lost: Bennis v. Michigan and the Forfeiture Tradition (1996) 61 Mo. L.Rev. 593; Ronner, Husband and Wife Are OneHim: Bennis v. Michigan as the Resurrection of Coverture (1996), 4 Mich. J. Gender & Law 129; Note, Will Innocent Owners Ever Have a Constitutionally Defensible Claim in a Civil Forfeiture: Don't Bet on It (1996) 20 Hamline L.Rev. 167; Comment, The Crime of Property: Bennis v. Michigan and the Excessive Fines Clause (1996) 74 Denv.U. L.Rev. 293.)
[7] In effect, the court rejected the claimant's attempt to turn the city into an unwitting participant in drug money laundering.